Jackson v. HCA Mgmt. Servs., LP, 2026 NCBC 69.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23CVS005013-100

JEFF JACKSON, Attorney General,
*ex rel.* DOGWOOD HEALTH TRUST,

Plaintiff,

v.

MH MASTER HOLDINGS LLLP,

Defendant.

**ORDER AND OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE**

1.     **THIS MATTER** arises from the alleged breach of an Amended and Restated Asset Purchase Agreement (APA) by Defendant MH Master Holdings LLLP (HCA).[1]  When HCA acquired Mission Hospital in 2019, it promised that it would "not discontinue the provision of" certain services for ten years.  The Attorney General alleges that HCA breached the APA by discontinuing the provision of some of these services in 2023.

2.     Before the Court are (1) the Attorney General's Motion for Partial Summary Judgment (the Attorney General's Motion), (ECF No. 141 [Pl.'s Mot.]); (2) HCA's Motion for Summary Judgment (HCA's Motion; and with the Attorney General's Motion, the Cross-Motions for Summary Judgment), (ECF No. 142 [Def.'s Mot.]); and (3) HCA's Motion to Exclude Plaintiff's Expert, Dr. Kia Parsi (the Motion

---

[1] HCA Healthcare, Inc. is the ultimate corporate parent of MH Master Holdings LLLP.  (Am. Compl. ¶ 7, ECF No. 50; Def.'s Answer & Countercls. Pls.' Am. Compl., Answer ¶ 7, ECF No. 55.)  The APA permits MH Master Holdings LLLP to "incorporate 'HCA' into any . . . naming, branding and marketing[.]"  (Am. Compl. Ex. 1 § 7.10, ECF No. 50.1.)   The Court refers to Defendant as HCA in this opinion.

to Exclude; and with the Cross-Motions for Summary Judgment, the Motions), (ECF No. 147 [Mot. Excl.]).

3. After considering the Motions, briefs, exhibits filed with respect to the Motions, oral arguments of counsel at a hearing on the Motions, and other relevant matters of record, the Court **GRANTS in part** and **DENIES in part** the Attorney General's Motion, **GRANTS in part** and **DENIES in part** HCA's Motion, and **DENIES** HCA's Motion to Exclude.

> *North Carolina Department of Justice, by Brian Rabinovitz, Llogan R. Walters, Daniel P. Mosteller, Danielle Wilburn Allen, Daniel T. Wilkes, Allyson S. Barkley, and Marc D. Brunton, for Plaintiff Attorney General Jeff Jackson ex. rel. Dogwood Health Trust.*

> *Latham & Watkins, LLP, by Nathan A. Sandals and Chase A. Chesser; Kirton McConkie, by Allen Gardner; and Roberts & Stevens, PA, by Phillip T. Jackson, John Noor, and David Hawisher, for Defendant MH Master Holdings, LLLP.*

Earp, J.

## I. FACTUAL AND PROCEDURAL BACKGROUND

4. The Court does not make findings of fact when ruling on motions for summary judgment but instead "summarizes the relevant evidence of record, noting both the facts that are disputed and those that are uncontested, to provide context for the claims and the [m]otions." *Aym Techs., LLC v. Rodgers*, 2019 NCBC LEXIS 64, at \*2 (N.C. Super. Ct. Oct. 16, 2019) (citing *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975)).

### A. The APA and Asset Sale

5.      On 30 August 2018, HCA, Mission Health System, Inc. (Mission Health), Dogwood Health Trust (Dogwood),[2] and other signatories executed an agreement providing for HCA's acquisition of Mission Health's assets.  The acquisition included Mission Hospital, a healthcare facility located in Asheville, North Carolina.  (Pl.'s Resp. Opp'n Def.'s Mot. Partial Summ. J. Ex. 2 [Initial Agmt.], ECF No. 93.3.)

6.      Section 7.13(a) of the Initial Agreement specified that HCA would "not discontinue the provision of the services set forth on Schedule 7.13(a)" absent an applicable exception.  The services included (i) "**[e]mergency and [t]rauma services** generally consistent with the current Level II Trauma Program with emergency services for pediatrics and adults, ground/air medical transport services and forensic nursing services"; and (ii) "**[o]ncology [s]ervices** – inpatient and outpatient cancer services, radiation therapy, surgery, chemotherapy, and infusion services."  (Initial Agmt.; Def.'s Br. Supp. Mot. Summ. J. Ex. 11 [Initial Agmt. Schedule], ECF No. 145.12.)  By letter dated 1 September 2018 and pursuant to N.C.G.S. § 55A-12-02(g),[3] Mission Health notified the Attorney General's Office of the

---

[2] Dogwood is a North Carolina non-profit corporation that has the right to enforce HCA's obligations under Section 7.13 of the APA.  (*See* Am. Compl. Ex. 1 §§ 1.1, 13.13(b), ECF No. 50.1; Pl.'s Br. Supp. Mot. Ex. 16, ECF No. 144.16.)

[3] N.C.G.S. § 55A-12-02(g) provides the following:

> A charitable . . . corporation shall give written notice to the Attorney General 30 days before it sells, leases, exchanges, or otherwise disposes of all, or a majority of, its property if the transaction is not in the usual and regular course of its activities . . . .  The Attorney General may require an additional 30-day period to review the proposed transaction by providing written notice to the

Initial Agreement (the Notice).  (Pl.'s Resp. Opp'n Def.'s Mot. Partial Summ. J. Ex. 4, ECF No. 93.5.)

7.  The Attorney General reviewed the Initial Agreement, conducted an investigation, and ultimately required several changes, but no changes were made to Section 7.13(a) and Schedule 7.13(a).  (Def.'s Br. Supp. Mot. Summ. J. Ex. 17, ECF No. 145.18; Am. Compl. Ex. 1 [APA], ECF No. 50.1; Initial Agmt.; Initial Agmt. Schedule.)  Based on the resulting Amended and Restated Asset Purchase Agreement (APA), the Attorney General issued a letter of nonobjection on 16 January 2019, approving the transaction.  (Def.'s Br. Supp. Mot. Summ. J. Ex. 18, ECF No. 145.20.)

8.  The APA was executed on or about 31 January 2019.  (*See* Am. Compl. ¶ 29, ECF No. 50; Def.'s Answer & Countercls. Pl.'s Am. Compl. [Answer & Countercls.], Answer ¶ 29, , ECF No. 55; Def.'s Mot. Partial Summ. J. Ex. 20, ECF No. 71.20.)  Thereafter, Mission Health changed its name to ANC Healthcare, Inc. (ANC) and began winding down.  (Dep. ANC Healthcare, Inc. [ANC Dep.] 44:13–45:5, 46:7–47:20, ECF No. 165.)

**B.  <u>The Key Terms</u>**

9.  In section 7.13(a) of the APA, HCA agreed that:

[u]nless otherwise consented to in writing by the Advisory Board for a period of ten (10) years immediately following the Closing Date, [HCA] **shall not discontinue the provision of the services set forth on Schedule 7.13(a)** . . . at the Mission Hospital Campus Facility . . . subject to Force Majeure making the provision of such services impossible or commercially unreasonable[.] . . . From and after

charitable or religious corporation prior to the expiration of the initial notice period.  During this 30-day period, the transaction may not be finalized.

N.C.G.S. § 55A-12-02(g).

such ten (10)-year period, unless otherwise consented to in writing by the Advisory Board, [HCA] shall continue the provision of each Mission Hospital / CarePartners Service at the Mission Hospital Campus Facility . . . subject to Force Majeure making the provision of such services impossible or commercially unreasonable . . . until such time as a Contingency is finally determined to have occurred in accordance with Section 7.13(d)[.]

(APA § 7.13(a) (emphasis added).)

10.     As stated above, Schedule 7.13(a) of the APA includes:

- **Emergency and Trauma services** generally consistent with the current Level II Trauma Program[4] with emergency services for pediatrics and adults, ground/air medical transport services and forensic nursing services[; and]

- **Oncology Services** – inpatient and outpatient cancer services, radiation therapy, surgery, chemotherapy, and infusion services.

(APA Schedule 7.13(a).)  The APA does not define the phrase "shall not discontinue"

or the term "provision."

11.     In addition to Section 7.13(a) and its schedule, the parties refer to

Section 7.13(c) of the APA in their arguments.  That section provides:

Unless otherwise consented to in writing . . . for a period of ten (10) years immediately following the Closing Date, [HCA] shall not sell or close any of the Material Facilities[5] unless Force Majeure makes the continued operation by [HCA] of the Material Facilities impossible or commercially unreasonable[.] . . . From and after such ten (10)-year period, unless otherwise consented to in writing . . . [HCA] shall not close any Material Facility . . . until such time as a Contingency is finally determined to have occurred[.]

(APA § 7.13(c).)

---

[4] To be designated as a Level II Trauma Center under North Carolina law, a hospital must meet the criteria "defined in the 'American College of Surgeons: Resources for Optimal Care of the Injured Patient.'"  10A N.C. Admin. Code 13P.0901(3) (2026).

[5] The "Material Facilities" include Mission Hospital.  (*See* APA § 1.1.)

12.     The APA defines "Contingency" in relevant part as "the active medical staffs of the applicable Material Facility not having qualified, available physicians and/or clinical staff that are in good standing and are necessary for [HCA] . . . to provide such Mission Hospital / CarePartners Service or continue such operation[.]" (APA § 1.1.)

13.     If the Attorney General determines that Dogwood has failed to exercise its right to enforce HCA's obligations under Section 7.13(a) of the APA, he must first notify Dogwood of his determination. (*See* APA § 13.13(b); Pl.'s Br. Supp. Mot. Ex. 16, ECF No. 144.16.) If Dogwood does not take appropriate action to enforce HCA's obligations within forty (40) days of receiving the notice, the Attorney General has the right to enforce HCA's obligations on Dogwood's behalf. (APA § 13.13(b).)

**C.    The Lawsuit**

14.     On 14 December 2023, the Attorney General initiated this action on Dogwood's behalf,[6] asserting two breach of contract claims against HCA for allegedly discontinuing the provision of certain (i) emergency and trauma services and (ii) oncology services at Mission Hospital. (*See generally* Compl., ECF No. 3.)

15.     On 26 April 2024, the Attorney General filed an Amended Complaint containing additional factual allegations but asserting the same claims for relief.

---

[6] The parties dispute whether the Attorney General properly notified Dogwood of Defendant's noncompliance with the APA as a prerequisite for bringing suit. (*See* APA § 13.13(b); Am. Compl. ¶ 204; Answer & Countercls., Affirm. Defenses ¶ 11.) However, neither party raised this issue with respect to the Motions, so the Court does not address it.

HCA filed its Answer and Counterclaims on 6 May 2024.[7]  (*See generally* Am. Compl.; Answer & Countercls.)

16.    The Attorney General alleges that "Mission Hospital's once efficient and orderly emergency department is now significantly degraded and unable to meet patients' needs" due, in part, to staffing levels that are inadequate to meet the requirements of a Level II Trauma Program and the inconsistent offering of surgical otolaryngology services.  (Am. Compl. 3, 22, 27, 33–34.)  The Attorney General further alleges that Mission Hospital's oncology services have degraded since the acquisition because it has no medical oncologists to monitor initial chemotherapy treatments ("first starts") and it has eliminated complex hematology services for adult patients with blood cancers, among other reasons.  (Am. Compl. ¶¶ 168, 182–85.)  The Attorney General relies on affidavits from some of Mission Hospital's patients and providers, (*see* Am. Compl. Exs. 3–23, ECF Nos. 50.3–.23), as well as findings by governmental agencies, (*see* Am. Compl. Ex. 25, Dep't Health & Human Servs. Ctrs. Medicare & Medicaid Servs. Stmt. Deficiencies [Stmt. Deficiencies], ECF No. 50.25).[8] HCA denies the Attorney General's allegations.  (*See generally* Answer & Countercls.)

---

[7] The Court dismissed HCA's Counterclaims with prejudice on 6 December 2024.  (Order & Opinion Mot. Dismiss Countercls. & Partial Mot. Dismiss Request Attys.' Fees, ECF No. 97); *Stein ex rel. Dogwood Health Tr. v. MH Master Holdings, LLLP*, 2024 NCBC LEXIS 152, at *16 (N.C. Super. Ct. Dec. 6, 2024).

[8] The Statement of Deficiencies was issued after an investigation of Mission Health's emergency department to determine its compliance with the Centers for Medicare and Medicaid Services' (CMS) Conditions of Participation.  (Stmt. Deficiencies 1); *see* 42 C.F.R. §§ 482.1–.104 (2026).  The investigation resulted in a finding of "Immediate Jeopardy (IJ) to patients' health and safety" as a result of incidents that occurred in 2022 and 2023, among other reasons.  (Stmt. Deficiencies 1, 7, 9.)

17.     On 26 July 2024 and prior to the end of discovery, HCA moved for partial summary judgment on the meaning of the words "shall not discontinue" in section 7.13(a) of the APA. (Def.'s Mot. Partial Summ. J., ECF No. 69.) The Court determined that the words were ambiguous and denied the motion. (*See* Order & Opinion Def.'s Mot. Partial Summ. J., ECF No. 133); *Jackson ex rel. Dogwood Health Tr. v. MH Master Holdings LLLP*, 2025 NCBC LEXIS 43, at *13–15 (N.C. Super. Ct. Apr. 16, 2025).

18.     Following the close of discovery, on 27 October 2025, the Attorney General filed a Motion for Partial Summary Judgment requesting that the Court (i) adopt his interpretation of Section 7.13(a) and (ii) determine that HCA breached the APA by discontinuing the provision of certain oncology services at Mission Hospital. (Pl.'s Mot.) On the same day, HCA filed a Motion for Summary Judgment requesting that the Court (i) adopt its interpretation of Section 7.13(a) and (ii) determine that it did not breach the APA with respect to the provision of either emergency and trauma services or oncology services. (Def.'s Mot.; Def.'s Br. Supp. Mot. Summ. J. [Br. Supp. Def.'s Mot.] 24, 26, ECF No. 145.) HCA also filed its Motion to Exclude the testimony of Dr. Kia Parsi, the Attorney General's expert, concerning services provided at Mission Hospital in 2023. (Mot. Excl.; Def.'s Br. Supp. Mot. Excl. Pl.'s Expert, Dr. Kia Parsi Ex. 1 [Parsi Initial Report], ECF No. 148.1.)

19.     The Motions were fully briefed, and the Court held a hearing on the Motions on 11 February 2026, at which all parties were represented by counsel. (Am. Notice Hearing, ECF No. 160.) The Motions are ripe for disposition.

## II. LEGAL STANDARD

20. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). "A genuine issue of material fact is one that can be maintained by substantial evidence." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 186–87 (2019) (citation modified). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Id.* at 187 (citation modified).

21. The party seeking summary judgment on the opposing party's claim bears the initial burden to establish the absence of a genuine issue of material fact. *James H.Q. Davis Tr. v. JHD Props., LLC*, 387 N.C. 19, 23 (2025) (quoting *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002)). Ordinarily, a movant may satisfy this burden by showing that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). "If the movant successfully makes such a showing, the burden then shifts to the nonmovant to come forward with specific facts establishing the presence of a genuine factual dispute for trial." *Halikierra Cmty. Servs. LLC v. N.C. Dep't of Health & Hum. Servs.*, 385 N.C. 660, 663 (2024) (quoting *Pennington*, 356 N.C. at 579).

22. A party who seeks summary judgment in its favor with respect to its own claims "must show that there are no genuine issues of fact, that there are no gaps in [its] proof, that no inferences inconsistent with [its] recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985).

23. The Court "may not resolve issues of fact and must deny the motion if there is a genuine issue as to any material fact." *Forbis v. Neal*, 361 N.C. 519, 524 (2007) (citing *Singleton v. Stewart*, 280 N.C. 460, 464 (1972)); *Gaynoe v. First Union Direct Bank, N.A.*, 2001 NCBC LEXIS 8, at *14 (N.C. Super. Ct. Jan. 18, 2001) ("The judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (citation modified)). When deciding the motion, the Court must consider the evidence in the light most favorable to the non-moving party. *Belmont Ass'n, Inc. v. Farwig*, 381 N.C. 306, 310 (2022) (quoting *Dalton v. Camp*, 353 N.C. 647, 651 (2001)).

24. As this Court has previously observed, "summary judgment is a drastic remedy that should be granted cautiously." *A-1 Pavement Marking, LLC v. APMI Corp.*, 2009 NCBC LEXIS 16, at *8 (N.C. Super Ct. June 26, 2009) (citing *First Fed. Sav. & Loan Ass'n v. Branch Banking & Tr. Co.*, 282 N.C. 44, 51 (1972)). "Where the slightest doubt exists as to the merits of the motion, it should be denied." *Id.* at *9 (citation omitted).

## III.     ANALYSIS

### A.     The Cross-Motions for Summary Judgment

25.     "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 276 (2019) (citation modified); *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 369 (2005) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26 (2000)).

26.     The parties do not dispute the existence of a valid contract.  Rather, the Cross-Motions for Summary Judgment address two main issues with respect to breach: (i) the scope of HCA's obligations given the language of the APA and (ii) HCA's compliance with those obligations.  The Court analyzes each issue in turn.

#### 1.     Section 7.13(a)

27.     "The goal of contract interpretation is to ascertain the intent of the parties when the contract was made." *Harris v. Ten Oaks Mgmt., LLC*, 2023 NCBC LEXIS 90, at *10 (N.C. Super. Ct. July 31, 2023) (citing *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 681 (2018)).  "Intent is derived not from a particular contractual term but from the contract as a whole." *State v. Philip Morris USA Inc.*, 363 N.C. 623, 631–32 (2009) (citation omitted).

28.     "When the parties use clear and unambiguous terms, the contract should be given its plain meaning, and the court can determine the parties' intent as a matter of law." *42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 513 (2012) (quoting *Alaimo Fam. Chiropractic v. Allstate Ins. Co.*, 155 N.C. App. 194, 197 (2002)).  In that event, "the court cannot look beyond the terms of the contract to determine

the intentions of the parties." *Lynn v. Lynn*, 202 N.C. App. 423, 431 (2010) (citation omitted).

29. If, however, the contract is ambiguous, interpretation of the contract is a question of fact. *See Recurrent Energy Dev. Holdings, LLC v. SunEnergy1, LLC*, 2017 NCBC LEXIS 18, at *27 (N.C. Super. Ct. Mar. 7, 2017) (quoting *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 525 (2012)). A contract is ambiguous if its language is "fairly and reasonably susceptible to either of the constructions asserted by the parties." *Gay v. Saber Healthcare Grp., L.L.C.*, 271 N.C. App. 1, 7 (2020) (citation omitted). While not dispositive, "[t]he fact that a dispute has arisen as to the parties' interpretation of the contract is some indication that the language of the contract is, at best, ambiguous." *Id.* (citation omitted). "[W]hether the language of a contract is ambiguous is a question of law[.]" *Morrell*, 371 N.C. at 680.

30. In the event contract language is ambiguous, the parties may introduce extrinsic evidence "not to contradict, but to show and make certain what was the real agreement between the parties." *See Galloway v. Snell*, 384 N.C. 285, 288 (2023) (quoting *Root v. Allstate Ins. Co.*, 272 N.C. 580, 590 (1968)); *Brown v. Ginn*, 181 N.C. App. 563, 567 (2007) ("Extrinsic evidence may be consulted when the plain language of the contract is ambiguous." (citations omitted)); *Inland Am. Winston Hotels, Inc. v. Crockett*, 212 N.C. App. 349, 354 (2011) (citation omitted). If the extrinsic evidence conflicts, however, an issue of material fact exists, and summary judgment should not be granted. *See Variety Wholesalers*, 365 N.C. at 524–25 (determining that

summary judgment was improper where extrinsic evidence supported both parties' interpretations of ambiguous contract); *Galloway*, 384 N.C. at 288 ("If a written contract is ambiguous, the contract's meaning and effect is a factual question[.]").

31.     Importantly, "[c]ourts are not at liberty to rewrite contracts for the parties. We are not their guardians, but the interpreters of their words. We must, therefore, determine what they meant by what they have said—what their contract is, and not what it should have been." *In re Estate of Sharpe*, 258 N.C. App. 601, 607 (2018) (quoting *Penn v. Standard Life Ins. Co.*, 160 N.C. 399, 402 (1912)); *Morrell*, 371 N.C. at 682 ("Courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein." (citation modified)).

32.     Section 7.13(a) of the APA states that HCA "*shall not discontinue* the *provision* of the services set forth on Schedule 7.13(a)" for ten years after the closing date of the transaction. (APA § 7.13(a) (emphasis added).) The parties disagree on the interpretation of this key language.

a.      "Shall Not Discontinue"

33.     Each of the parties posits a reasonable interpretation of the phrase "shall not discontinue." *See MH Master Holdings LLLP*, 2025 NCBC LEXIS 43, at *13–15. Accordingly, the Court turns to the extrinsic evidence to determine whether it is consistent with respect to the intent of the contracting parties such that summary judgment would be appropriate. It is not.

34.     The Attorney General argues that the phrase "shall not discontinue" requires HCA to continuously provide, at least at pre-acquisition levels, the same services set forth in Schedule 7.13(a) that Mission Hospital provided at the time of the acquisition.  (*See* Br. Supp. Pl.'s Mot. Partial Summ. J. [Br. Supp. Pl.'s Mot.] 8–10, 14–16, ECF No. 143.)  The Attorney General also contends that a service may be constructively discontinued if it is so inadequately provided that patients will not or cannot utilize it.  (*See* Br. Supp. Pl.'s Mot. 29; Resp. Def.'s Mot. Summ. J. [Br. Opp'n Def.'s Mot.] 13, ECF No. 156.)

35.     In support of his position that HCA is required to provide the services on Schedule 7.13(a) at no less than pre-acquisition levels, the Attorney General cites extrinsic evidence including HCA's agreement with the Notice, which states that "a critical part of the transaction is the obligation of [HCA] to safeguard (and improve) *the current operations and services* of Mission [Hospital]."  (Notice 17 (emphasis added); Tierney Email to Esposito, Sep. 1, 2018, ECF No. 93.6 ("[HCA is] good with the [N]otice.").)

36.     The Attorney General also cites a statement made in January 2018 by Dr. John Ball, then-chair of Mission Health's Board, which was attached to the Notice and poses the following question concerning Mission Health's future: "what approach *minimally maintains and ideally expands* our safety net and health transformation capabilities[?]"  (Dr. John Ball's Stmt. Directors Bd. Retreat 1, ECF No. 144.4 (emphasis added).)[9]  The Attorney General cites a similar statement that Dr. Ball

---

[9] HCA contends that Dr. John Ball's 2018 statements are inadmissible hearsay but offers little support for its objection.  (*See* Def.'s Opp'n Pl.'s Mot. Partial Summ. J. 11 n.2, ECF No.

made on 29 August 2018: "[t]he [APA] provides the best chance for the clinical programs, services, and facilities *to continue* throughout the region . . . *with the quality, access, and affordability that the people of this region have come to expect of us.*" (Stmt. John R. Ball, MD, JD – Mission Health Sys. Bd. Directors 2, ECF No. 144.4 (emphasis added).)

37.     Further, the Attorney General cites a letter Dr. Ball provided to the Attorney General's office in January 2019, in which he states that "[t]he Mission Board firmly believed – and still believes – that the partnership between Mission and HCA is essential to *Mission's continuing ability to operate at least at its current level.*" (Br. Supp. Pl.'s Mot. Ex. 6, at NCAG_0000090521, ECF No. 144.6 (emphasis added).)

38.     In addition, the Attorney General relies on a series of emails sent between August 20 to 22, 2018 by Dr. Ronald Paulus, Mission Health's then-CEO, to one of HCA's representatives, Chuck Hall, when negotiating language regarding the services HCA would be required to maintain under the forthcoming initial APA:

> [T]he two things [the Mission Health] Board cares about are: 1) the size of the foundation; and 2) *that the services available today at Mission Hospital are going to be here for at least 10 years.*
>
> . . . .
>
> I have to have some reference to *services being generally consistent with those services provided as of signing.*

---

154); N.C. R. Evid. 802; *cf. Maxwell Foods, LLC v. Smithfield Foods, Inc.*, 2025 NCBC LEXIS 66, at *14 n.4 (N.C. Super. Ct. June 5, 2025) ("[Plaintiff] does not do enough to develop its arguments, resting on conclusory assertions of inadmissibility rather than meaningful analysis.").

. . . .

We have been going back and forth most substantively about whether the list is illustrative or literal. I made it illustrative, then you deleted that. I added back "generally consistent with" and then you used those same words but neutered their meaning. We each have been doing so for understandable reasons – you don't want ill-defined mandates in case there is an argument about "well that meant this" and I have been trying to "keep services as they essentially are today" knowing that it is impossible to ever define such a list.

The reality on my end is that all discussion internally – with the [Mission Health] Board, with management, etc. has been based upon "*Mission Hospital as we know it will continue as we know it for at least ten years*, unless the Advisory Board agrees otherwise." This was an essential underlying aspect of even beginning discussions with HCA. I would have never gotten [the Mission Health Board] to move otherwise[.]

. . . .

With that said, my revisions do the following:

1.     I've accepted that you are unwilling to have the list be a general description (which is what has been our understanding from the beginning). That's incredibly painful and I may be criticized widely, but if we don't trust one another, we shouldn't do the deal.

. . . .

3.     I've taken out the parentheses and e.g., modifiers, to reflect that this is now a literal list. I'm trusting you that the myriad of obvious things that aren't listed (e.g., general x-ray, etc.) will be continued out of common sense.

. . . .

The very first question I'm going to be asked by the [Mission Health] Board tomorrow at 4 pm is "do we have agreement on the protected services list", and I will have to give them an honest answer. They will ask me to personally reassure them that "*this protects Mission Hospital as we know it*."

(Def.'s Mot. Partial Summ. J. Ex. 10 [Paulus Emails], ECF No. 71.10 (emphasis added).)

39. Finally, the Attorney General points to HCA's own internal documents, including compliance trackers ("Post-Close Commitment Checklists"), as well as attestations of service, all referring to HCA's continuous provision of services. The compliance trackers describe as a requirement that HCA "[c]ontinue services currently provided at Mission's primary Asheville hospital[.]" (Br. Supp. Pl.'s Mot. Ex. 1, ECF No. 144.1; Br. Supp. Pl.'s Mot. Ex. 10, ECF No. 144.10 (30 August 2019 email explaining that the commitment checklists were provided to the HCA team in conjunction with the deal closing.).) The attestation of service is an annual audit form by which the CEO of Mission Hospital attested that the services in Schedule 7.13(a) "were continuously offered . . . for Mission Hospital" for the year. (*See* Br. Supp. Pl.'s Mot. Exs. 12–13, ECF Nos. 144.12–.13.) Summaries of Key Post-Closing Covenants included in the APA state that HCA "will not discontinue any services currently provided at [Mission Hospital]." (Br. Supp. Pl.'s Mot. Ex. 2, ECF No. 144.2.)

40. HCA responds that nothing in the APA requires it to provide the same quality or quantity of services that Mission Hospital provided at the time of the acquisition. (Def.'s Opp'n Pl.'s Mot. Partial Summ. J. [Br. Opp'n Pl.'s Mot.] 14, ECF No. 154.) Instead, HCA contends that the phrase "shall not discontinue" requires only that it refrain from *completely eliminating* a Schedule 7.13(a) service. (Br. Opp'n Pl.'s Mot. 17; Br. Supp. Def.'s Mot. 27–28.)

41.    In support of its position, HCA points to the declaration of Chadd Tierney, HCA's lead negotiator with respect to the APA.  (Br. Opp'n Pl.'s Mot. 16.)  In his declaration, Tierney asserts that Mission Health "conceded that Schedule 7.13(a) would comprise a literal and exclusive list of the specific service lines . . . *without reference to any particular levels or volume of any particular service.*"  (Br. Opp'n Pl.'s Mot. Ex. 33 [Tierney Decl.] ¶ 27, ECF No. 146.13 (emphasis added).)

42.    Characterizing Mr. Tierney's affidavit as "self-serving," the Attorney General argues that the Tierney affidavit should not be considered as competent evidence upon which to award summary judgment.  (*See* Br. Opp'n Def.'s Mot. 7 (citing *N.C. Farm Bureau Mut. Ins. Co. v. Herring*, 385 N.C. 419, 426 (2023) ("[T]he party with the burden of proof, who moves for summary judgment supported only by his own affidavits, will ordinarily not be able to meet these requirements and thus will not be entitled to summary judgment."  (emphasis omitted))).)

43.    HCA relies on the same emails from Dr. Paulus to Mr. Hall that the Attorney General cites, but it reads them as evidence that the parties understood Schedule 7.13(a) to be a "literal list of services that must not be *ceased entirely.*"  (Br. Opp'n Pl.'s Mot. 16–17 (emphasis added).)  HCA argues that Dr. Ball's statements confirm that Mission Health "did *not* expect the status quo to continue at Mission[,]" given his assertion that the initial agreement provided the "*best chance* for the clinical programs, services, and facilities to continue throughout the region[.]"  (Br. Opp'n Pl.'s Mot. 12.)  HCA concludes that, at best, a genuine issue of material fact exists as

to the meaning the contracting parties intended this term to have. (Br. Opp'n Pl.'s Mot. 14.)

44. The Court agrees that, when the extrinsic evidence is considered, there are inconsistencies that eliminate the possibility of judgment on this issue at this stage of the litigation. *See Variety Wholesalers*, 365 N.C. at 524–25. The phrase "shall not discontinue" is ambiguous because this language is "fairly and reasonably susceptible to either of the constructions" the parties assert. *See Gay*, 271 N.C. at 7 (citation omitted); *MH Master Holdings LLLP*, 2025 NCBC LEXIS 43, at \*9–15. The APA does not define this language, and both parties have presented evidence to support their respective interpretations. HCA argues, however, that the Attorney General is equitably estopped from asserting his interpretation of the phrase, so before reaching a conclusion, the Court considers this argument.

b. Equitable Estoppel

45. HCA contends that the Attorney General is equitably estopped from asserting his view that the phrase "shall not discontinue" means that HCA is required to maintain the Schedule 7.13(a) services at pre-acquisition levels because the Attorney General knew that the contracting parties did not intend to impose quality or quantity standards yet did not attempt to clarify the ambiguity before approving the transaction. (Br. Supp. Def.'s Mot. 32–34; Def.'s Reply Br. Supp. Mot. Summ. J. [Reply Def.'s Mot.] 14–16, ECF No. 158.) In support of its argument, HCA points to an email between employees of the Attorney General's Office that was written during the Attorney General's review of the transaction. (Br. Supp. Def.'s Mot. 32–33.) In

the email, Jennifer Harrod—a lawyer on the Attorney General's team—tells other members of the team that "the [Mission Health] board thinks [HCA] has agreed to maintain *current* hospital services at *current* levels. That's not what the APA says, and [HCA] says it would not have agreed to do this." (Br. Supp. Def.'s Mot. Ex. 28, ECF No. 146.8 (emphasis added).)

46. At the hearing, the Attorney General argued that Ms. Harrod's statement is consistent with the Attorney General's position that the APA requires HCA to provide only the *scheduled* services at "current levels," not *all* the hospital's services. In any event, the Attorney General maintains that HCA has not explained how his subordinate's understanding of the contracting parties' agreement constitutes his misrepresentation or concealment of material facts, or how HCA relied to its detriment on his office's internal understanding, such that equitable estoppel would prevent him from advancing his interpretation of the APA here. (Br. Opp'n Def.'s Mot. 17.)

47. HCA replies that "(1) the Attorney General falsely represented his interpretation of the [amended] APA . . . to [HCA] and [Mission Health] before issuing his Non-Objection letter; (2) [HCA] relied on that representation (and Non-Objection) to close on the transaction; and (3) [HCA] was prejudiced by that reliance because it operated under the [amended] APA consistent with that interpretation to this day." (Reply Def.'s Mot. 14–16; *see also* Br. Supp. Def.'s Mot. 32–34.) HCA further contends that applying the doctrine of equitable estoppel against the Attorney

General in these circumstances will not impair the exercise of the Attorney General's governmental powers. (Reply Def.'s Mot. 14.)

48. As evidence that the Attorney General's office made HCA aware of the Attorney General's understanding, HCA refers to "talking points" prepared by Ms. Harrod in preparation for a meeting with HCA. (Reply Def.'s Mot. 15.) The talking points state, in relevant part, "[e]ven now, the [Mission Health] board believes that HCA has committed to maintaining the current level of services at all six hospitals . . . even though the [initial asset purchase agreement] says no such thing." (Br. Supp. Def.'s Mot. Ex. 1, ECF No. 145.2.)

49. Generally, to establish the defense of equitable estoppel, one must show that "the party sought to be estopped: '(1) misrepresented or concealed material facts; (2) intended that such misrepresentation or concealment be acted upon by the other party; and (3) had knowledge, actual or constructive, of the true facts.'" *Syro Steel Co. v. Hubbell Highway Signs, Inc.*, 108 N.C. App. 529, 532 (1993) (quoting *Neal v. Craig Brown, Inc.*, 86 N.C. App. 157, 163–64 (1987)). In addition, "[t]he party asserting the defense must have (1) a lack of knowledge and the means of knowledge as to the real facts in question; and (2) relied upon the conduct of the party sought to be estopped to [its] prejudice." *Chapel H.O.M. Assocs., LLC v. RME Mgmt., LLC*, 256 N.C. App. 625, 627–28 (2017) (quoting *Friedland v. Gales*, 131 N.C. App. 802, 807 (1998)).

50. Reliance by the party asserting estoppel must be justified. *See Silwal v. Akshar Lenoir, Inc.*, 292 N.C. App. 274, 288 (2024) (quoting *Bourne v. Lay & Co.*, 264

N.C. 33, 37 (1965)); *Lockerman v. S. River Elec. Mbrshp. Corp.*, 250 N.C. App. 631, 643 (2016) (quoting *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 369 (2014)). "However, where the estoppel is based upon a subsequent inconsistent position, it is not necessary that the party to be estopped be aware of the falsity of the representation when made." *Meacham v. Montgomery Cnty. Bd. of Educ.*, 59 N.C. App. 381, 387 (1982) (citation modified).

51. North Carolina courts "have not sanctioned the use of estoppel against governmental agencies to the same extent as [it is] used against private individuals or private corporations." *Hayes v. Town of Fairmont*, 130 N.C. App. 125, 128 (1998) (citing *Henderson v. Gill*, 229 N.C. 313, 316 (1948)); *N.C. Dep't of Env't Quality v. TRK Dev., LLC*, 259 N.C. App. 597, 604 (2018) (citation omitted). "A governmental entity may be estopped in a particular instance only if it is necessary to prevent a loss to another and the estoppel will not impair the exercise of governmental powers." *Kings Mt. Bd. of Educ. v. N.C. State Bd. of Educ.*, 159 N.C. App. 568, 577 (2003) (citation omitted); *TRK Dev., LLC*, 259 N.C. App. at 604 (citation omitted).

52. Importantly, "[a] trial court may only grant a summary judgment motion based on the doctrine of estoppel 'where there is but one inference that can be drawn from the undisputed facts of a case.'" *Tuckett v. Guerrier*, 149 N.C. App. 405, 412 (2002) (quoting *Keech v. Hendricks*, 141 N.C. App. 649, 653 (2000)). If the evidence raises a permissible inference that estoppel applies, "but there are other inferences to be drawn from the evidence to the contrary, estoppel is a question of

fact[.]" *Meachan v. Montgomery Cnty. Bd. of Educ.*, 47 N.C. App. 271, 278 (1980); *Tuckett*, 149 N.C. App. at 412 (quoting *Keech*, 141 N.C. App. at 653–54).

53. The Court agrees with HCA that the application of equitable estoppel in this action would not impair the exercise of the Attorney General's *governmental* powers to approve or disapprove the transaction pursuant to section 55A-12-02(g) of the North Carolina General Statutes. Instead, through its estoppel defense, HCA intends to bar the Attorney General from asserting his interpretation of the phrase "shall not discontinue." As such, the application of estoppel affects the Attorney General's ability to *enforce* the APA, which is a right afforded by contract, not a governmental power. (*See* APA § 13.13(b)); *TRK Dev., LLC*, 259 N.C. App. at 607 (use of estoppel improper where government agency would be barred from enforcing Solid Waste Management Act); *City of Raleigh v. Fisher*, 232 N.C. 629, 635 (1950) (use of estoppel improper where city would be barred from enforcing zoning ordinance); *Cnty. of Wake v. N.C. Dep't of Env't & Nat. Res.*, 155 N.C. App. 225 (2002) (applying estoppel to government agency in contractual dispute).

54. Nevertheless, the Court concludes that it would be improper to grant HCA summary judgment on the basis of equitable estoppel. Among other reasons, it is not clear on this record that the Attorney General agreed with his subordinate's reading of the relevant language. And, while it appears in "talking points," the record is not clear that the information was ever relayed to HCA. It is also not clear that HCA relied on the Attorney General's purported misrepresentation when it agreed to the terms of the APA. Even so, whether HCA's reliance on the Attorney General's

purported misrepresentation is justified is more properly resolved by a factfinder after evidence is presented. *See MH Master Holdings LLLP*, 2025 NCBC LEXIS 43, at \*15–16; *see also Gore v. Myrtle/Mueller*, 362 N.C. 27, 39 (2007) (citing *Forbis*, 361 N.C. at 527–28) (noting that determining reliance is an issue of fact for estoppel purposes).

55. Therefore, for purposes of HCA's Motion, the Court shall not estop the Attorney General from advancing his interpretation of the term "shall not discontinue," an interpretation that conflicts with HCA's interpretation. Accordingly, the Cross-Motions for Summary Judgment are **DENIED** to the extent they concern an interpretation of this phrase.

c. "Provision"

56. To recap, the APA states that HCA "shall not discontinue *the provision of the services* set forth on Schedule 7.13(a)." (APA § 7.13(a) (emphasis added).) HCA contends that the word "provision" means only that it is required to provide the "infrastructure"—that is, the facilities, staff, and equipment—necessary for physicians to provide Schedule 7.13(a) services at Mission Hospital, if they choose to do so. (Br. Supp. Def.'s Mot. 26–30; Br. Opp'n Pl.'s Mot. 29–30.) In support of its position, HCA reasons that only a medical provider can provide medical services. It argues that "a *hospital* is not a physician—it is not a person at all. As a result, a hospital provides services by making space, equipment, staff, and other resources available so that a credentialed provider can care for willing patients." (Reply Def.'s Mot. 7–8.)

57.     The Attorney General responds that the term "provision" requires HCA to do all things necessary to provide the services listed in Schedule 7.13(a), not just to supply the infrastructure necessary for physicians who might choose to use it. (*See* Br. Supp. Pl.'s Mot. 9–10, 26; Reply Def.'s Opp'n Pl.'s Mot. Partial Summ. J. [Reply Pl.'s Mot.] 14, ECF No. 157; Br. Opp'n Def.'s Mot. 3–9.)

58.     The Attorney General also contends that Section 7.13(c)—which requires that HCA "not sell or close" Mission Hospital for ten years after the acquisition absent an applicable exception—would be superfluous if Section 7.13(a) merely required HCA to provide facilities for the provision of services. (Br. Supp. Pl.'s Mot. 16–17; APA § 7.13(c).) He argues that inclusion of the Contingency provision in Section 7.13(a) proves that, at least for the first ten years after the acquisition, the lack of sufficient physicians or clinical staff would not excuse HCA from providing Schedule 7.13(a) services. (Br. Supp. Pl.'s Mot. 21.)

59.     On this point, HCA responds that the requirements of Sections 7.13(a) and (c) are complementary and that neither provision renders the other superfluous. (Br. Opp'n Pl.'s Mot. 20–21.) Specifically, HCA argues that Section 7.13(a) controls how it uses Mission Hospital and other facilities, while Section 7.13(c) requires only that it refrain from disposing of the facilities. (Br. Opp'n Pl.'s Mot. 20–21.)

60.     After consideration, the Court agrees with the Attorney General. The term "provision" means "the act or process of providing." *Provision*, Merriam-Webster, https://www.merriam-webster.com/dictionary/provision (last visited July 20, 2026). The term "provide," in turn, means "to supply or make available." *Provide*,

Merriam-Webster, https://www.merriam-webster.com/dictionary/provide (last visited July 20, 2026). As such, the APA requires that HCA not discontinue supplying or making Schedule 7.13(a) services available to Mission Hospital's patients. It is unreasonable, then, to interpret the APA as merely requiring HCA to provide the infrastructure for Schedule 7.13(a) services and to leave a determination regarding whether the services are actually provided to third-party physicians. If HCA wanted a different result, it should have said so.

61. Therefore, the Court shall **GRANT** the Attorney General's Motion concerning interpretation of the word "provision."

### 2. Schedule 7.13(a)

62. Schedule 7.13(a) lists the "[i]npatient and outpatient services" to which Section 7.13(a) refers. (APA Schedule 7.13(a).) These services include "**Emergency and Trauma services** generally consistent with the current Level II Trauma Program with emergency services for pediatrics and adults, ground/air medical transport services and forensic nursing services" and "**Oncology services** – inpatient and outpatient cancer services, radiation therapy, surgery, chemotherapy, and infusion services." (APA Schedule 7.13(a).)

#### a. Oncology Services

63. The Attorney General's Motion focuses on HCA's alleged discontinuation of (1) complex hematology services for adult patients with blood cancers, and (2) initial chemotherapy treatments (first starts). The Court addresses each service below.

### i. Complex Hematology Services

64. As a threshold matter, the Attorney General argues that the term "Oncology Services" is broad and encompasses the subcategory of complex hematology services for adult patients with blood cancers. (Br. Supp. Pl.'s Mot. 31 & n.7; Reply Pl.'s Mot. 12.) HCA disagrees and contends that hematology services were specifically discussed and excluded from the services listed in Schedule 7.13(a). (Br. Opp'n Pl.'s Mot. 25–26.)

65. The term "Oncology Services" is "fairly and reasonably susceptible" to including the treatment of blood cancers. On the other hand, the treatment of blood cancers could fall under the heading of hematology, rather than oncology. Looking at the words in context does not help. The specific terms that follow the general term "Oncology Services" ("inpatient and outpatient cancer services, radiation therapy, surgery, chemotherapy, and infusion services") do not identify the types of cancers included by organ or body part but rather describe services common to cancers generally. Thus, whether the contracting parties intended for "Oncology Services" to include or exclude services for adult patients with complex blood cancers is unclear based on the language of the contract alone.

66. Turning to extrinsic evidence of the parties' intent, HCA points to evidence that the word "hematology" was removed from the services listed on Schedule 7.13(a) during negotiations. (Br. Opp'n Pl.'s Mot. 25.) Specifically, a July 2018 draft of Schedule 7.13(a) listed "hematology/oncology" services together as part of the "Mission Cancer Clinical Program," but the word "hematology" is absent from the final Schedule. (Br. Opp'n Pl.'s Mot. 25. *Compare* APA Schedule 7.13(a) (omitting

"hematology" from final schedule), *with* Br. Supp. Def.'s Mot. Ex. 24, ECF No. 146.4

(listing "hematology/oncology" in draft schedule).)

67.     HCA also points to the Rule 30(b)(6) deposition testimony of Neil Luria, the CEO and "Chief Wind-Down Officer" of ANC Healthcare, Inc., concerning Schedule 7.13(a):

> Q. Did seller understand that if a service didn't make the list, there was no guarantee HCA would provide it post-closing?
>
> . . . .
>
> A. Yes.
>
> Q. So seller understood at the time of closing the [APA] that Schedule 7.13(a) was a literal list of the services that HCA promised to provide going forward?
>
> A. Yes.
>
> . . . .
>
> Q. All right.  So this is seller's draft of what it wanted, initially, in Schedule 7.13(a), correct?
>
> A. Yes.
>
> Q: And if we take just a quick peruse of it, it's clear that a lot of requested services -- a lot of services that seller initially requested make it on to - 7.13(a) didn't make it.  Right?
>
> A.  Yes.
>
> . . . .
>
> Q. Hematology did not make it onto the ultimate Schedule 7.13(a), did it?
>
> A. That is correct.

Q. Now, seller could have put [its] foot down and said, "If hematology does not continue post acquisition, we don't have a deal" -- but, that didn't happen. Right?

A. That's correct.

(ANC Dep. 22:13–22:22, 25:01–26:14.)

68.     Luria was designated to testify about "ANC Healthcare, Inc.'s understanding and interpretation of the APA on January 31, 2019 and its basis for such understanding and interpretation." (Notice Taking Dep. ANC Healthcare, Inc., ECF No. 164.) Luria testified that the former Mission Health changed its name to ANC Healthcare, Inc. as a result of the transaction so that it would be known as ANC during its wind-down. (ANC Dep. 48:4–24.) [10]

69.     The Attorney General contends that ANC's understanding of the APA is irrelevant because it was not involved in negotiating the APA and came into existence only to wind down the entity. (Br. Supp. Pl.'s Mot. 25 & n.6.) Conversely, HCA argued during the hearing that naming ANC Healthcare, Inc. in the deposition notice was appropriate because that is the name by which the former Mission Health, the seller, became known after the transaction closed.

70.     Luria testified that he understood Mission Health and ANC to be the *same entity* on January 31, 2019, and he also understood that both were referenced as "Seller." (*See* ANC Dep. 10:6–9, 47:4–20.) Thus, to the extent the Attorney

---

[10] The Court takes judicial notice of the Restated Articles of Incorporation filed by Mission Health System, Inc. with the North Carolina Secretary of State on 31 January 2019, the closing date of the transaction. *See* N.C. R. Evid. 201; *Worley v. Ormond*, 2024 NCBC LEXIS 82, at *14 n.6. (N.C. Super. Ct. June 11, 2024). The Articles change the name of Mission Health System, Inc. to ANC Healthcare, Inc. effective 1 February 2019.

General's argument is that Luria did not testify on behalf of Mission Health (now ANC), it is not supported by the evidence.[11]  However, there is merit to the Attorney General's argument that Mr. Luria was never asked directly for the seller's interpretation of the language at issue in this case.  Consequently, in Mr. Luria's testimony both sides can find support, or at least not conflict, with their respective positions.

71.    HCA next relies on Mr. Tierney's declaration.  Tierney, one of HCA's lead negotiators for the deal, testified that Mission Health "sought to include hematology as a listed service on Schedule 7.13(a).  We removed that service . . . because Mission had not historically provided hematology services on a consistent basis.  Seller accepted this deletion[.]"  (Tierney Decl. ¶ 28.)  Further, HCA argues, the hospital has not discontinued complex hematology services for adult patients with blood cancers because it has provided the service to at least four patients since 2023.  (Br. Opp'n Pl.'s Mot. 25–26; Dep. Martin Palmeri [Palmeri Dep.] 325:6–24, ECF No. 146.14; Dep. Hillary Rosenfeld 147:2–148:16, ECF No. 144.23.)

72.    In response, the Attorney General argues that emails from Mission Health's chief negotiator, Dr. Paulus, prove that "[e]ven a 'literal list' of services [would] still be comprised of several unstated component services[,]" such that the APA's failure to expressly list "hematology services" does not indicate that

_____

[11] Similarly, the Attorney General's argument during the hearing that Mr. Luria was not personally present during contract negotiations is unavailing.  Mr. Luria was designated to testify on behalf of ANC, not in his personal capacity.  Notably, he testified that he prepared for the deposition by conferring with Mr. Paulus, who was the lead negotiator for the seller with respect to the language at issue.  (ANC Dep. 10:12–21.)

those services are excluded. (Br. Opp'n Def.'s Mot. 11; Paulus Emails, at MISSION0000063117 ("I'm trusting you that the myriad of obvious things that aren't listed . . . will be continued out of common sense.").) The Attorney General also cites to Dr. Paulus' email stating that, in negotiating the APA, he had been "trying to 'keep services essentially as they are'" and points out that those services included complex hematology services. (*See* Br. Opp'n Def.'s Mot. 11; Paulus Emails, at MISSION0000063117; *see also* Aff. Martin Palmeri [Palmeri Aff.], ECF No. 50.10; Palmeri Dep. 325:6–9 (testifying that complex hematology services existed prior to the acquisition).)

73. In addition, in response to an inquiry from the Attorney General in June 2023 regarding the hospital's medical staff, HCA provided a count of its physicians credentialed in oncology and included within the subspecialties "Hematology/Oncology," suggesting that it recognized that at least some hematology services were included under the oncology umbrella. (Br. Supp. Pl.'s Mot. Ex. 30, ECF No. 144.30.)

74. The Attorney General also references Mission Health's current website, which lists "blood cancer" services as part of its *oncology* program, to support his argument that "Oncology Services" is a broad term that both Mission Health and HCA understood in 2019 to include hematology services. (Br. Opp'n Def.'s Mot. 11 n.2.)

75. As for the four patients who were treated, the Attorney General responds that they were exceptions who were *in extremis* and their treatment is not

evidence that the service continued to be provided to the patient population as a whole. (Reply Pl.'s Mot. 12–13.)

76. The Court concludes that the extrinsic evidence is not conclusive with respect to the meaning of "Oncology Services" and, therefore, judgment with respect to an interpretation of the term would not be proper at this stage. As HCA contends, removal of the term "hematology" from the schedule indicates that the parties to the APA may not have intended for Schedule 7.13(a) to cover complex hematology services for blood cancers. On the other hand, Dr. Paulus' emails support the Attorney General's argument that Mission Health and HCA understood Schedule 7.13(a) to encompass services that were not expressly listed. And, after hearing all the evidence, a fact-finder could conclude that use of the term "hematology/oncology" in the draft schedule could have meant, contrary to HCA's argument, that the parties recognized an overlap between the two and decided that it was not necessary to use the word hematology.

77. As for HCA's argument that it has complied with the APA even if "Oncology Services" is read to include hematology services, the Court again concludes that summary judgment is not appropriate on this record. (*See* Br. Opp'n Pl.'s Mot. 25–26; Br. Supp. Def.'s Mot. 23, 37.) Harkening back to its earlier argument regarding the interpretation of "shall not discontinue," HCA contends that it did not discontinue complex hematology services because it provided the services to at least four patients in 2023. (Br. Opp'n Pl.'s Mot. 26; Palmeri Dep. 325:6–24.) The Attorney General responds that the instances in which HCA actually provided hematology

services were "extremely limited" exceptions, and such services were otherwise unavailable at Mission Hospital by the end of 2023. (Reply Pl.'s Mot. 12–13.) Because the Court cannot interpret the term "shall not discontinue" as a matter of law at this stage, it cannot enter judgment on whether HCA complied or failed to comply with the APA by providing complex hematology services to these few patients in 2023.

78. Therefore, the Cross-Motions for Summary Judgment are **DENIED** to the extent they request that the Court determine as a matter of law based on this record whether (a) "Oncology Services" includes complex hematology services for adult patients, and (b) HCA breached the APA by discontinuing the provision of these hematology services.

### ii. Initial Chemotherapy Treatments

79. The Attorney General contends that HCA breached the APA in 2023 by discontinuing the provision of initial chemotherapy treatments (first starts), which must be monitored by an oncologist. (Br. Supp. Pl.'s Mot. 31–38; Palmeri Dep. 77:12–18.) Specifically, the Attorney General argues that after (i) the Messino oncology group, with which Mission Health had a professional services agreement, left, and (ii) Dr. Michael Burke, a medical oncologist who was employed by the hospital, resigned, HCA had no mechanism in place to ensure that first starts were continuously provided at pre-acquisition levels. (*See* Br. Supp. Pl.'s Mot. 8–10, 31–38; Br. Supp. Pl.'s Mot. Ex. 26, ECF No. 144.26 (HCA's response to Attorney General's inquiry regarding coverage following Dr. Burke's resignation).) The Attorney General concludes that the proof is in the numbers: 128 new cancer patients were

seen by Mission-employed oncologists in December 2022, but only 10 were seen in December 2023. (*See* Br. Supp. Pl.'s Mot. 35–36; Updated Correspondence Data Rosenfeld Dep. 1, ECF No. 144.27.)

80. The Attorney General also presents the affidavit of Dr. Albert Quiery, a hematologist who was recruited by HCA to "rebuild" the oncology program after the Messino group ended its contractual relationship with Mission Hospital. (Br. Supp. Pl.'s Mot. 34–35; Aff. Albert T. Quiery, Jr., MD, MSc, FACP [Quiery Aff.] ¶ 9, ECF No. 50.2.) Quiery testifies that he was unable to retain the oncologists he recruited for Mission Hospital "due to unresolved practice issues," including but not limited to staffing issues that he characterizes as rising to the level of "concerns regarding patient safety." (Quiery Aff. ¶ 11.) In addition, he describes what he calls a "maladaptive management style" of hospital administrators and decries what he believes is a "fundamental lack of understanding of cancer services." (Quiery Aff. ¶ 11.)

81. HCA responds by again reprising its argument that "shall not discontinue" means only that it must not eliminate a service altogether. It argues that the hospital does, in fact, have a medical oncologist from the Hope Women's Cancer Center on staff who is capable of monitoring first starts. In addition, HCA contends that the Attorney General has presented no evidence that any patient sought their first chemotherapy treatment at Mission and was refused that service. (Br. Opp'n Pl.'s Mot. 29–30; Reply Def.'s Mot. 22–23.)

82.     The Court concludes that the record does not support summary judgment concerning HCA's compliance with respect to initial chemotherapy treatments.  As stated above, the term "shall not discontinue" remains ambiguous. Even if HCA's interpretation were to prevail, the record contains conflicting evidence regarding whether the provision of initial chemotherapy treatments was eliminated in 2023.  (*See* Palmeri Aff. ¶ 28; Palmeri Dep. 324:3–16, 327:7–328:12; Pl.'s Br. Opp'n Def.'s Mot. Partial Summ. J. Ex. 12, ECF No. 93.13 (text message from Chad Patrick, former CEO of Mission Hospital, to Dr. Palmeri stating, "[t]he Monday after Thanksgiving won't be able to start new pts.").  *But see* Br. Supp. Pl.'s Mot. Ex. 32, ECF No. 144.32 (letter from then president of HCA Healthcare, Inc.'s North Carolina Division, Greg Lowe, stating that first chemotherapy treatments "may take place in another department of the hospital" after the departure of Mission Hospital's last employed oncologist).)  And, although Dr. Palmeri testified that there were patients who needed the service and were unable to receive it at Mission Hospital in 2023, he also testified that in certain circumstances, the service was available in the inpatient setting.  (Palmeri Dep. 324:3–16, 327:7–328:12.)

83.     Thus, while it appears that the volume of new chemotherapy patients dropped significantly in late 2023 after the Messino group and Dr. Burke left, and while Dr. Quiery's affidavit raises significant questions regarding why the hospital's relationships with those physicians ended, the Court cannot conclude on this record as a matter of law that the services were, in fact, "discontinued."

84.     Therefore, the Cross-Motions for Summary Judgment are **DENIED** to the extent the Attorney General requests that the Court determine as a matter of law that HCA breached the APA by discontinuing the provision of initial chemotherapy treatments, and to the extent HCA requests that the Court determine that it complied with the Oncology Services provision of the APA.

b.      Emergency and Trauma Services

85.     Like Oncology Services, the APA contains no express reference to metrics that must be satisfied for HCA to be in compliance. However, unlike Oncology Services, Schedule 7.13(a) specifies that HCA must provide emergency and trauma services "generally consistent with the current Level II Trauma Program." To determine whether HCA has met this obligation, one must understand what is required by the "current Level II Trauma Program."

86.     The American College of Surgeons' (ACS) criteria for verification as a Level I, II, or III Trauma Center include Type I and II standards. (*See* Def.'s Br. Supp. Mot. Summ. J., Ex. 25 [2022 ACS Manual], ECF No. 146.5; Am. Coll. Surgeons, Resources for Optimal Care of the Injured Patient 2014 (2014) [2014 ACS Manual].)[12]

---

[12] The Court takes judicial notice of the 2014 and 2022 ACS Manuals pursuant to North Carolina Rule of Evidence 201. The Court also takes judicial notice of the contents of the ACS website. *See* N.C. R. Evid. 201; *McGriff Ins. Servs. v. Hudson*, 2023 NCBC LEXIS 4, at *24 n.6 (N.C. Super. Ct. Jan. 17, 2023).

The Court observes that the ACS periodically publishes updated manuals, with the most recent manuals having been published in 2014 and 2022. *See* Meera Kotagal et al., *The COT at 100: Setting the Standard for Quality Programs*, Am. Coll. of Surgeons (May 1, 2022), https://www.facs.org/for-medical-professionals/news-publications/news-and-articles/bulletin/2022/may-2022-volume-107-number-5/the-cot-at-100-setting-the-standard-for-quality-programs/; *see also Trauma Verification, Review, and Consultation Program*, Am. Coll. of Surgeons, https://www.facs.org/quality-programs/trauma/quality/verification-review-and-consultation-program/ (last visited July 20, 2026).

A hospital will not become or remain designated at any level if it is determined that the hospital is non-compliant with any Type I standard or more than three Type II standards. (2022 ACS Manual, at ix; 2014 ACS Manual 159.) Although the ACS' criteria "do not constitute a standard of care and are not intended to replace the medical judgment of [a] physician or health care professional in individual circumstances[,]" (2022 ACS Manual, at i), these criteria exist to "ensure that . . . trauma centers are available to provide high quality definitive care." (2014 ACS Manual 1–2, 7, 158 ("The goal of this and previous revisions is to set appropriate standards for the optimal care of the trauma patient . . . and verify that quality outcomes are present[.] The American College of Surgeons' (ACS') . . . program validates the resources needed for high-quality care at trauma centers."); *see also* 2022 ACS Manual, at v ("ACS Quality Programs are developed according to a four-part framework used to evaluate and improve quality of care, consisting of . . . infrastructure needed to deliver high-quality, high-value care[.]").)

87. Both parties cite the 2022 ACS Manual at various times in the record, and neither cite the 2014 ACS Manual. (*See, e.g.*, Am. Compl. ¶ 45; Br. Supp. Def.'s Mot. 9 n.3, 18 n.8.) However, as the APA requires that HCA maintain emergency and trauma services generally consistent with Mission Hospital's *current* Level II Trauma Program, that is, the Level II Trauma Program in existence at the time of the transaction, it would appear that the 2014 ACS Manual—not the 2022 ACS Manual—is the relevant one. *See* Kotagal et al., *supra* note 12.

88.     Nevertheless, the differences in language between the two manuals are not significant for the standards at issue.  For example, one Type II standard requires that the "patient-to-nurse ratio in the ICU not exceed two to one[.]"  (2014 ACS Manual 183.)  The same standard in the 2022 ACS Manual is that "the patient-to-nurse ratio in the ICU must be 1:1 or 2:1, depending on patient acuity as defined by the hospital policy for ICU nursing staffing."  (2022 ACS Manual 60.)  Another Type II standard states that "[t]rauma centers must be able to provide the necessary human and physical resources (physical plant and equipment) to properly administer acute care consistent with their level of verification."  (2014 ACS Manual 164; *see also* 2022 ACS Manual 3 ("In all trauma centers, the institutional governing body, hospital leadership, and medical staff must . . . provide the necessary human and physical resources to properly administer trauma care consistent with the level of verification[.]").)  One Type I standard requires that an otolaryngology surgeon be "promptly available."  (2014 ACS Manual 76, 83.)  The same standard in the 2022 ACS Manual is that "Level I and II trauma centers must have continuous availability" of an otolaryngology surgeon.  (2022 ACS Manual 61.)

89.     The Attorney General alleges that HCA breached the APA because the quality of the emergency and trauma services provided by Mission Hospital "degraded" (a) in part from a lack of adequate nursing staff and (b) because HCA failed to offer surgical otolaryngology (ENT) services on a consistent basis.  (Am. Compl. ¶¶ 45–48, 85–87, 206–215.)

90.    HCA responds that it is improper to conflate regulatory findings with breach of contract and, in any event, (i) the APA does not require Mission Hospital to maintain a particular patient-to-nurse staffing ratio (and even if it did, Mission Hospital's staffing grids are designed to meet the ratio set out by the American College of Surgeons);  (ii) any variations in staffing resulted from "universal challenges" caused by the coronavirus pandemic;[13] (iii) the Attorney General offers no admissible evidence that Mission Hospital did not consistently offer surgical ENT services; and (iv) Mission Hospital retained its designation as a Level II Trauma center throughout 2023.  (Br. Supp. Def.'s Mot. 29–31, 35–36.)

91.    On the last point, the Attorney General replies that HCA's compliance with the APA cannot be determined based on Mission Hospital's status as a Level II Trauma Center because North Carolina's renewal process for that designation happens only once every four years.  (Br. Opp'n Def.'s Mot. 12–13, 19–20.)  The Attorney General further argues that CMS' finding of immediate jeopardy reflects the fact that, by 2023, the quality of services provided by Mission Hospital had degraded to the degree that it would have been "impossible for Mission to provide emergency and trauma services generally consistent with the Level II Trauma Program in place at the time of the transaction."  (Br. Opp'n Def.'s Mot. 19–20.)  The Attorney General maintains that "[t]he problem . . . is not the violation of unstated [quantity and quality] metrics, but the fact that without sufficient staff, HCA cannot

---

[13] Despite HCA's mention of COVID, neither party argued that the *force majeure* clause in the APA applies.

safely provide care to its [emergency and trauma services] patients." (Br. Opp'n Def.'s Mot. 13.)

92.     The Court first addresses HCA's motion with respect to the Attorney General's allegation that HCA breached the APA by not offering surgical ENT services "24 hours per day every day of the year." (Am. Compl. ¶ 86.)  HCA responds that, while it may have had lapses in surgical ENT coverage, its coverage was "generally consistent" with the Level II Trauma Program.  HCA also asserts that the Attorney General has not come forward with any evidence of its alleged noncompliance.  (*See* Br. Supp. Def.'s Mot. 35.)  After reviewing the sizeable record in this case, the Court agrees that the Attorney General has not identified such evidence.[14]

93.     "Summary judgment should be granted in favor of the defendants if the record shows the absence of evidence tending to support an essential element of the plaintiff's claim."  *Brown v. City of Greensboro*, 137 N.C. App. 164, 166–68 (2000) (dismissing claim where plaintiff "neither alleged nor presented evidence" supporting her discrimination claim).  "When a plaintiff fails to produce any evidence of an

---

[14] The Court is aware of an article that originally ran in the Asheville Watchdog and is cited in the Complaint, but not for its content about ENT services. (Compl. ¶ 180 n.172.) According to the article, seven doctors from Asheville Ear, Nose & Throat decided to stop providing medical or surgical ENT services at Mission in January 2022.  It says nothing about conditions in 2023.  The article is hearsay to the extent it would be used to evidence a lack of ENT services. *Rankin v. Food Lion*, 210 N.C. App. 213, 220 (2011) ("[N]ewspaper articles are inadmissible hearsay to the extent that they are introduced to prove the factual matters asserted therein." (citation omitted)).

If other evidence exists, the Attorney General has not identified it.  As this Court has previously stated, "[i]t is not the Court's 'job to sift through the record and make [the Attorney General's] case for him.' "  *Brewster v. Powell Bail Bonding, Inc.*, 2020 NCBC LEXIS 27, at *9 (N.C. Super. Ct. Mar. 11, 2020) (citation omitted).

essential element of her claim, the trial court's grant of summary judgment is proper." *Hill v. West*, 189 N.C. App. 189, 193 (2008) (citation omitted).

94. Accordingly, HCA's Motion shall be **GRANTED** to the extent the Attorney General alleges that HCA breached the APA by failing to offer the surgical ENT services required to maintain its Level II designation.

95. The Court next addresses the Attorney General's assertion that, by 2023, HCA's staffing, particularly its patient-to-nurse ratio, was not "generally consistent with the current Level II Trauma Program." Both the 2014 and the 2022 ACS Manuals contain staffing ratios that had to be met for the hospital to satisfy Level II Trauma Program requirements. The 2014 ACS Manual states that a trauma center's "patient-to-nurse ratio in the ICU must not exceed two to one[.]" (2014 ACS Manual 183; *see also* 2022 ACS Manual 60 ("In all trauma centers, the patient-to-nurse ratio in the ICU must be 1:1 or 2:1, depending on patient acuity[.]").) In addition, the 2014 ACS Manual requires that, "[t]rauma centers must be able to provide the necessary human and physical resources (physical plant and equipment) to properly administer acute care consistent with their level of verification." (2014 ACS Manual 164; *see also* 2022 ACS Manual 3 ("In all trauma centers, the institutional governing body, hospital leadership, and medical staff must . . . provide the necessary human and physical resources to properly administer trauma care consistent with the level of verification[.]").)

96. While disavowing the notion that his claim for breach turns on HCA's failure to satisfy any particular metric, the Attorney General also argues that, at least

at some points in 2023, HCA's staffing ratios did not meet these ACS standards. Concerning patient-to-nurse ratios in the Intensive Care Unit, one Mission Hospital employee testified that "[t]he patient-to-nurse ratio used to be 2 to 1 at a maximum. . . . Now the patient-to-nurse ratio is often 3 to 1[.]" (Aff. Mark Klein, R.N. [Klein Aff.] ¶ 17, ECF No. 50.13.) Another Mission Hospital employee testified that, in the ICU, "patient-to-nurse ratios of 3 to 1 are not uncommon. It is also not uncommon for acute patients that require a patient-to-nurse ratio of 1 to 1 to instead be staffed 2 to 1. Ratios exceed appropriate levels every day." (Aff. Hannah Drummond [Drummond Aff.] ¶ 9, ECF No. 50.5.)

97.    The same Mission Hospital employees testified that, in December 2023, patient-to-nurse ratios in the Emergency Department exceeded those that existed at the time the transaction closed in 2019. (*See* Klein Aff. ¶¶ 16, 38–40 ("Prior to the purchase of Mission Hospital by HCA, the ER had patient-to-nurse ratios of 3-1. Now there are routinely patient-to-nurse ratios of 4-1 plus hallway patients. . . . The [Internal Processing Area] (IPA) is new in the last year and was not a feature of Mission prior to HCA's purchase. In the IPA, there can be 20 to 40 patients and only 1 or 2 nurses to manage them."); Drummond Aff. ¶¶ 14–15 ("Patient-to-nurse ratios [in the IPA] can get as bad as 30 to 1. . . . Some mornings begin with 0 nurses available in the IPA for patient care.").

98.    These employees' affidavits correspond with observations made by both the Attorney General's expert, Dr. Kia Parsi, and CMS in its Statement of Deficiencies. Specifically, Dr. Parsi stated that Mission Hospital's 2023 staffing plan

was the lowest he had ever seen for "any emergency department, let alone a Level II Trauma Center[.]" (Parsi Initial Report 12–13.) Similarly, in the Statement of Deficiencies, CMS found that Mission Hospital's "emergency department staff failed to ensure adequate nursing staff was available to provide and monitor the delivery of assessments, care, and treatments in the emergency department." (Stmt. Deficiencies 167, 173–79.)

99. Mission Hospital's employees testified that, because of staffing inadequacies, by 2023, the hospital could no longer provide emergency and trauma services that were "adequate" or conformed to "general standards of care." (*See* Drummond Aff. ¶ 20; Klein Aff. ¶ 51; *see also* Aff. Tucker Richards ¶¶ 3, 5–9, 12–15, 19, ECF No. 50.12; Aff. Scott Joslin, M.D. ¶¶ 11–13, 15, 20, 22–24, ECF No. 50.8.) Dr. Parsi concluded that "it is not possible for an [emergency department] to have that low a staffing plan and provide adequate care." (Parsi Initial Report 13.) CMS concluded that Mission Hospital did not "meet the emergency needs of patients in accordance with acceptable standards of practice." (Stmt. Deficiencies 309.)

100. In sum, given its patient-to-nurse staffing ratios, it appears that by 2023 Mission Hospital had difficulty always providing emergency and trauma services that were consistent with the Level II Trauma Program. However, the language of the APA does not require that such services *always* be provided. Instead, the contract requires that Mission Health provide emergency and trauma services *generally consistent* with the Level II Trauma Program, and what the contracting parties meant by "*generally consistent*" is not clear.

101. It is also unclear that HCA's ratios would have jeopardized its Level II designation. HCA presents the testimony of Melanie Wetmore, then-Chief Nursing Officer for Mission Hospital, who testified that, at least in Mission Hospital's ICU, staffing ratios only exceeded Level II Trauma program standards in 2023 "less than four times a month[.]" (Dep. Melanie Wetmore 39–40, 48:12–51:8, ECF No. 146.20; Br. Supp. Def.'s Mot. 35; Reply Def.'s Mot. 17.) According to HCA, "[s]uch deviations are permitted by ACS standards, which categorizes nurse-to-patient staffing ratios as Type II standards for which a finding of program noncompliance is not automatic." (Reply Def.'s Mot. 17; Br. Supp. Def.'s Mot. 9 n.3, 18 n.8; 2014 ACS Manual 159, 183; 2022 ACS Manual, at ix, 60.) Still, a fact-finder could conclude that missing this staffing ratio approximately four times a month—or 48 times a year—is not "generally consistent" with Level II Trauma Program requirements.[15]

102. Accordingly, issues of fact remain that preclude summary judgment with respect to whether HCA has satisfied its obligation to provide emergency and trauma services "generally consistent" with the current Level II Trauma Program. The Court shall therefore **DENY** HCA's Motion with respect to the emergency and trauma services provision.

---

[15] Standard dictionary definitions do not add much value. "Generally" is defined to mean "in disregard of specific instances and with regard to an overall picture; as a rule[;] usually[.]" *See Generally,* Merriam-Webster, https://www.meriam-webster.com/dictionary/generally (last visited July 20, 2026). "Consistent" means "marked by harmony, regularity, or steady continuity[;] free from variation or contradiction[.]" *Consistent,* Merriam-Webster, https://www.merriam-webster.com/dictionary/consistent (last visited July 20, 2026). Thus, "generally consistent" means that, as a rule, Mission Health's nurse-to-patient ratio was usually free from variation from Level II trauma program requirements.

**B.** **HCA's Motion to Exclude**

103.    HCA moves to exclude the expert testimony of Dr. Kia Parsi, a physician, professor, and Executive Director of the Texas A&M University Rural and Community Health Institute (RCHI), whose testimony is presented by the Attorney General to support the Attorney General's position that HCA breached the APA with respect to Mission Hospital's provision of both (i) emergency and trauma services and (ii) oncology services.

104.    The Court evaluates a motion to exclude expert testimony under Rule 702 of the North Carolina Rules of Evidence, "which is now 'virtually identical to its federal counterpart and follows the *Daubert* standard for admitting expert testimony.'" *Loyd v. Griffin*, 2023 NCBC LEXIS 34, at *6 (N.C. Super. Ct. Mar. 6, 2023) (citation omitted); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

105.    To be admissible under Rule 702, expert testimony must satisfy a three-part test for relevance, competence, and, reliability: "(1) expert testimony must be based on specialized knowledge that will assist the trier of fact, (2) the expert must be qualified by 'knowledge, skill, experience, training, or education,' and (3) the testimony must be reliable." *Loyd*, 2023 NCBC LEXIS 34, at *6–7 (quoting N.C. R. Evid. 702(a)); *State v. McGrady*, 368 N.C. 880, 889–90 (2016). North Carolina courts may seek guidance from federal case law when evaluating the admissibility of expert testimony. *McGrady*, 368 N.C. at 887–88.

106.    Under Rule 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence."  N.C. R. Evid. 401. Expert testimony is relevant if it meets the "minimum standard for logical relevance" under Rule 401 and "provide[s] insight beyond the conclusions that jurors can readily draw from their ordinary experience."  *McGrady*, 368 N.C. at 889 (citation omitted). Relevance under Rule 401 is a "low bar" to admissibility.  *State v. Triplett*, 368 N.C. 172, 175 (2015).

107.  Expert testimony is reliable if "(1) [t]he testimony is based upon sufficient facts or data[,]" (2) "[t]he testimony is the product of reliable principles and methods[,]" and (3) "[t]he witness has applied the principles and methods reliably to the facts of the case."  N.C. R. Evid. 702(a)(1)–(3).  "[T]he requirement that expert opinions be supported by 'sufficient facts or data' means that the expert considered sufficient data to employ the methodology."  *Pope v. Bridge Broom, Inc.*, 240 N.C. App. 365, 374 (2015) (citation modified).  An expert need not consider all available facts or data for his opinion to be based upon sufficient facts or data.  *Miller v. Carolina Coast Emergency Physicians, LLC*, 382 N.C. 91, 105 (2022).  Further, "experts may rely on data and other information supplied by third parties, even if the data were prepared for litigation by an interested party.  Unless the expert's opinion is too speculative, it should not be rejected as unreliable merely because the expert relied on the reports of others."  *Pope*, 240 N.C. App. at 374 (citation modified).  "[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility."  *Id.* (citation omitted).

108.   "The precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony.  In each case, the trial court has discretion in determining how to address the three prongs of the reliability test." *McGrady*, 368 N.C. at 890 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152–53 (1999)).  Importantly, "the focus of the trial court's inquiry must be solely on the principles and methodology used by the expert, not the conclusions that they generate." *Loyd*, 2023 NCBC LEXIS 34, at *7 (citation modified); *Daubert*, 509 U.S. at 595.

109.   "[A]n expert may not testify as to 'whether legal conclusions should be drawn or whether legal standards are satisfied.'" *Intersal, Inc. v. Wilson*, 2024 NCBC LEXIS 18, at *11, *16 (N.C. Super. Ct. Feb. 1, 2024) (quoting *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 587 (1991)).  Instead, "the expert may testify to the underlying factual premise." *Id.* (citation modified); *see Potts v. KEL, LLC*, 2019 NCBC LEXIS 61, at *8–9 (N.C. Super. Ct. Sep. 27, 2019) (citations omitted) ("Whether conduct was grossly negligent is a legal conclusion that the trier of fact must draw from the evidence, not a proper subject of expert testimony.").  Ultimately, whether to grant or deny a motion to exclude is within the trial court's sound discretion. *See Miller v. Carolina Coast Emergency Physicians, LLC*, 277 N.C. App. 449, 474 (2021) (citing *Crocker v. Roethling*, 363 N.C. 140, 143 (2009)).

110.   Dr. Parsi opines that, under HCA's leadership, (i) "Mission Hospital had significantly degraded emergency and trauma services and created an Emergency Department that was not capable of providing safe and timely healthcare expected of

a Level II Trauma Center"; and (ii) "Mission Hospital's outpatient and inpatient oncology services significantly degraded." (Parsi Initial Report 2–3; Rebuttal Report Kia Parsi, M.D. [Rebuttal Report], ECF No. 148.3.) HCA contends that Dr. Parsi's testimony should be excluded because it is both irrelevant and unreliable. (Def.'s Br. Supp. Mot. Excl. [Br. Supp. Mot. Excl.] 4, ECF No. 148.) For the reasons stated below, the Court disagrees.

### 1. Relevance

111. HCA first contends that the Court should exclude Dr. Parsi's testimony because it is irrelevant. (Br. Supp. Mot. Excl. 4.) HCA argues (i) Dr. Parsi did not review the APA before issuing his reports and uses the wrong standard to determine whether a breach occurred; and (ii) Dr. Parsi does not use an objective measure for determining whether a Schedule 7.13(a) service was "discontinue[d]" when he opines that the services provided by Mission Hospital's Emergency Department "degraded." (Br. Supp. Mot. Excl. 7–9.)

112. The Attorney General responds that Dr. Parsi's report is relevant because it provides insight on critical facts in dispute: "how and to what degree . . . Mission's emergency and trauma services . . . degraded over time after HCA's acquisition of Mission." (Pl.'s Resp. Mot. Excl. [Br. Opp'n Mot. Excl.] 8–9, ECF No. 151.) The Attorney General further contends that the fact that Dr. Parsi "does not answer the ultimate question of whether a breach occurred" is appropriate because "[t]hat judgment is for the Court." (Br. Opp'n Mot. Excl. 9.)

113. The Court agrees with Plaintiff that Dr. Parsi's opinions are relevant. Dr. Parsi's extensive experience as a medical practitioner and in hospital administration is undisputed. He draws on this experience to conclude that both Mission Hospital's emergency and trauma services and its oncology services "significantly degraded" in 2023—both with respect to the services themselves, as well as with respect to the facilities, equipment, and ancillary staff necessary to provide those services. (*See generally* Parsi Initial Report; Rebuttal Report.) Dr. Parsi's testimony bears on facts the Court must consider when determining whether HCA complied with the APA. That Dr. Parsi does not opine on the meaning of the term "discontinue" or whether HCA breached the contract is not determinative. Any such opinion would fall outside his province as an expert. *See Intersal*, 2024 NCBC LEXIS 18, at *16.

114. In short, the standard for relevance is low. It has been met here.

### 2. Reliability

#### a. Sufficient Facts or Data

115. Whether Dr. Parsi's testimony is reliable requires additional analysis under Rule 702. HCA contends that Dr. Parsi's reports should not be considered because they are "not based on sufficient facts or opinions." (Br. Supp. Mot. Excl. 12.) According to HCA, Dr. Parsi's opinions "simply regurgitate[] anecdotal reports of purported events at Mission . . . without acknowledging—or even reviewing—contradictory deposition testimony[.]" (Br. Supp. Mot. Excl. 12–13.)

116. The Attorney General responds that "Dr. Parsi relied upon a wide range of sources" in forming his opinions and that he is only required to base his testimony

on "*sufficient* facts or data, not upon *all* the facts or data in existence[.]" (Br. Opp'n Mot. Excl. 14–15 (quoting *Miller*, 382 N.C. at 105).)

117. The Court agrees with the Attorney General. Dr. Parsi's reports reflect that he relied on numerous sources in forming his opinions, including (i) affidavits from patients and providers at Mission Hospital; (ii) affidavits from EMS personnel who transported patients to, or monitored patient wait times at, Mission Hospital's emergency department; (iii) the 2023 Statement of Deficiencies from the North Carolina Department of Health and Human Services and the Centers for Medicare and Medicaid Services (CMS), concluding that patients' health and safety were in "Immediate Jeopardy" at Mission Hospital; (iv) a position statement from the American Academy of Emergency Medicine (AAEM) on patient-to-nurse staffing ratios in emergency departments; and (v) HCA's own internal documents concerning wait times for Mission Hospital's emergency department. (Parsi Initial Report 23; Rebuttal Report 16–18; *see also* Am. Compl. Exs. 3–23, 25, ECF Nos. 50.3–.23, .25.)

118. The listed sources provide sufficient data for Dr. Parsi to reach his opinions. *See, Loyd*, 2023 NCBC LEXIS 34, at *8–9 (expert opinion based on, in part, deposition testimony, letters of intent, and financial documents was based on sufficient facts or data for expert to conduct damages analysis); *Brakebush Bros., Inc. v. Certain Underwriters at Lloyd's of Lond. – Novae 2007 Syndicate Subscribing to Pol'y with No. 93PRX17F157*, 2024 NCBC LEXIS 137, at *7–13 (N.C. Super. Ct. Oct. 16, 2024) (expert opinion admissible in insurance dispute where expert "reviewed hundreds of documents . . . including financial information, the actual repair and

replacement cost information, invoices, spreadsheets, [and] specifications"); *Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC*, 2024 NCBC LEXIS 48, at \*13 (N.C. Super. Ct. Mar. 15, 2024) (observing that the "sufficient facts or data" analysis is "quantitative rather than qualitative").

119. The reliability of the sources Dr. Parsi considered may affect the weight of his testimony. *See Pope*, 240 N.C. App. at 374. However, Dr. Parsi's reliance on third-party information, even if prepared by Plaintiff for litigation, does not render his testimony inadmissible. *See id.*; *Maxwell*, 2025 NCBC LEXIS 66, at \*14–15 ("That [defendant's expert] formed [his] opinions by applying his expertise to facts and information provided by [defendant] is normal, not disqualifying." (quoting *Brakebush*, 2024 NCBC LEXIS 137, at \*11)). Accordingly, the Court shall not exclude Dr. Parsi's opinions on this basis.

b. <u>Reliable Principles and Methods</u>

120. HCA next contends that Dr. Parsi's reports should be excluded because his opinions are not based on a reliable methodology. (Br. Supp. Mot. Excl. 13–14.) HCA maintains that Dr. Parsi reached his conclusion that Mission Hospital's emergency and trauma services and its oncology services "significantly degraded" without explaining the objective measure by which he reached this conclusion. (Br. Supp. Mot. Excl. 14.) In short, HCA argues that Dr. Parsi's opinions are not reliable because they are not based "on reliable sources or any apparent methodology," and Dr. Parsi "simply relied on what [Plaintiff] provided to him and did not seek out any

additional documents or data to review." (Def.'s Reply Br. Supp. Mot. Excl. [Reply Mot. Excl.] 7–8, ECF No. 152.)[16]

121. The Attorney General responds that Dr. Parsi used reliable resources when forming his opinions including (i) information and findings from the government's Immediate Jeopardy determination, (ii) the AAEM's recommended patient-to-nurse ratio, and (iii) academic literature concerning emergency department patient outcomes. (Br. Opp'n Mot. Excl. 16–19.) The Attorney General contends that Dr. Parsi then used "his knowledge and understanding of hospital operations" to evaluate Mission Hospital's performance against the data and standards established in these resources. (Br. Opp'n Mot. Excl. 18–19.) The Attorney General maintains that experiential expertise has been recognized as reliable, and that Dr. Parsi's testimony should not be scrutinized using the standard of reliability applied to scientific testimony. (Br. Opp'n Mot. Excl. 19–20.)

122. The Court concludes that Dr. Parsi's opinions are based on a reliable methodology and that he applied that methodology to the facts of the instant case appropriately. That Dr. Parsi relied on his experience in the field is not a bar to the admissibility of his opinions. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004) (affirming trial court's decision that "personal experience, training, method of observation, and deductive reasoning" constituted reliable methodology even if not replicable); *accord Kumho Tire*, 526 U.S. at, 150 ("Engineering testimony

---

[16] HCA also contends that Dr. Parsi's testimony fails to meet the standard for admissibility under Rule 403. (Reply Mot. Excl. 11–13.) The Court does not address this argument because it was raised for the first time in HCA's reply. *See* Business Court Rule 7.7 ("A reply brief must be limited to matters newly raised in the responsive brief.").

rests upon scientific foundations. In other cases, the relevant reliability concerns may focus upon personal knowledge or experience. There are many different kinds of experts, and many different kinds of expertise." (citation modified)).

123. Dr. Parsi is a physician, professor, and Executive Director of the Texas A&M University Rural and Community Health Institute (RCHI). He has over twenty-seven years of clinical experience. (Parsi Initial Report 1.) He has extensive experience in hospital administration, including responsibility for developing a hospital system's Level 2 Trauma Service Line. (Parsi Initial Report 1, App. B, B-2–3.) As RCHI's Executive Director, he leads a team of experts that evaluates federal and state healthcare regulations and quality and safety initiatives. (Parsi Initial Report 1.)

124. In sum, Dr. Parsi has extensive experience relevant to the matters at issue in this case. His experience and opinions reflect familiarity with the standards governing hospital systems and the resources needed to ensure the effective delivery of care. As such, Dr. Parsi may reliably use his personal experience to evaluate Mission Hospital's performance. *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2025 NCBC LEXIS 91, at \*19–22 (N.C. Super. Ct. July 29, 2025) (holding that expert testimony relying on expert's experience was admissible where testimony was "guided by [expert's] deep understanding" of relevant "regulations, process[es], and procedures," and expert "held several director roles" relevant to his testimony).

125. Accordingly, the Court shall **DENY** without prejudice HCA's motion to exclude Dr. Parsi's opinions. Nothing herein limits the Court's ability to further evaluate the admissibility of Dr. Parsi's conclusions at a trial of this matter.

## IV. CONCLUSION

126. **WHEREFORE**, the Court **GRANTS in part** and **DENIES in part** the Motions as follows:

a.  HCA's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. To the extent the Attorney General claims that HCA breached the APA by failing consistently to offer surgical otolaryngology services, HCA's Motion for Summary Judgment is **GRANTED**. In all other respects, HCA's Motion is **DENIED**.

b.  The Attorney General's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. To the extent the Attorney General argues that the term "provision" requires HCA to take all steps necessary to actually provide the services set forth in Schedule 7.13(a), the Attorney General's Motion is **GRANTED**. In all other respects, the Attorney General's Motion for Summary Judgment is **DENIED**.

c.  The Motion to Exclude is **DENIED without prejudice**.

**SO ORDERED**, this the 27th day of July, 2026.

/s/ Julianna Theall Earp
_____
Julianna Theall Earp
Special Superior Court Judge
  for Complex Business Cases